# Exhibit A

L8UHFirC

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

FIRST LOOK INSTITUTE, INC., et
al.,

                Plaintiffs,

        v.                              21 Civ. 4024 (GHW)

NATIONAL INSTITUTES OF HEALTH,

                Defendant.
                                        Telephone Conference
------------------------------x
                                        New York, N.Y.
                                        August 30, 2021
                                        4:00 p.m.

Before:

                    HON. GREGORY H. WOODS,

                                        District Judge

                        APPEARANCES

VICTORIA NOBLE
     Attorney for Plaintiffs
     -and-
PEPPER HAMILTON LLP
BY: DAVID STEVEN BRALOW

AUDREY STRAUSS
     United States Attorney for the
     Southern District of New York
BY: ALEXANDER JAMES HOGAN
     Assistant United States Attorney
```

1         (The Court and all parties present remotely)

2         THE COURT:  Let me hear first from each of the
3  parties.  Can I ask you to please state your appearances.
4  Please follow the following instruction:  I'd like for the
5  principal spokesperson for each side to identify herself and
6  the members of her team if there are multiple lawyers on the
7  line for each side.

8         So let me begin with counsel for plaintiff.  Counsel.

9         MS. NOBLE:  Good afternoon, your Honor.  This is
10 Victoria Noble from First Look Institute, which publishes in
11 *The Intercept*.  I'm joined today by David Bralow, also from
12 First Look Institute.

13        THE COURT:  Very good.  Who's on the line for
14 defendant?

15        MR. HOGAN:  Hello, your Honor.  This is Alexander
16 Hogan from the U.S. Attorney's Office, for the defendant.

17        THE COURT:  So briefly, just a few instructions about
18 the rules that I'd like you to follow during this conference:

19        First, please remember that this is a public
20 proceeding.  Any member of the public or press is welcome to
21 join our conference.

22        Second, please state your name each time you speak
23 during the conference.

24        Third, please keep your lines on mute at all times,
25 except when you're intentionally speaking to me or one of the

1  other parties.
2          Fourth, obey instructions by the court reporter which
3  are intended to help her do her job.
4          And finally, I'm ordering that there be no recording
5  or rebroadcast of all or any portion of today's conference.
6          So, counsel, with those introductory remarks out of
7  the way, I'd like to turn to a discussion of the substance of
8  the conference.
9          First, let me hear from the government regarding the
10 status of your current efforts to produce records consistent
11 with my prior order.  Can you give me an update?
12         MS. NOBLE:  Yes, your Honor.  I checked with NIH on
13 Friday as I was filing the letter that your Honor likely saw on
14 Friday afternoon.  They anticipate that they are on schedule.
15 They're still working out various redactions, but they are,
16 indeed, optimistic that they will be able to produce in
17 accordance with your Honor's order.
18         THE COURT:  Very good.  Thank you very much.
19         Let's talk about the remaining categories of records.
20 If I recall correctly, we left off after our last conference
21 with a request that the United States look into more
22 information about the documents in its possession so that we
23 can discuss, with more information in hand, a schedule for
24 production of the additional materials that are outstanding.  I
25 have seen the government's letters, both your August 27 letter

1   and your August 9 letter.  What I'd like to hear from the
2   government first is what your proposal is to complete the
3   response to the plaintiffs' application.
4           Counsel.
5           MR. HOGAN:  Yes, your Honor.  So I know that
6   plaintiffs have requested a certain priority as to the
7   documents that they're looking for, and I believe that, after
8   the priority grants that are going to be produced later this
9   week, they had been intending to seek next in their priority
10  the communications related to those priority grants, which, for
11  the reasons laid out in the letter of August 27, the exact
12  scope of that is up in the air at the moment.
13          So what NIH was intending to propose, regardless of
14  that additional issue about not knowing the scope of how many
15  such communications there are, NIH was going to propose that
16  the next batch of documents to be produced would be the
17  nonpriority grants.  And the reason for that is not only the
18  certainty of what they entail, but, moreover, there is indeed a
19  lot of public interest with respect to all of these grants that
20  went to this given entity, EcoHealth, both the priority grant
21  that plaintiffs are seeking, but just more fully all of the
22  grant that they may have received from NIH.  So I believe that
23  NIH's hope was that they would be able to process those grants
24  next and then put them into some type of public, I believe,
25  reading room so that it would be able to accomplish a more --

1   even outside the context of this litigation, a fuller public
2   disclosure in light of this is not the only case that is sort
3   of looking into these grants.
4   　　　　So NIH's proposal would be to turn to those next,
5   produce them at a rate consistent with what they initially
6   advocated for in the July letter to the Court, which was 300
7   pages per month.  So in light of the fact there being about 900
8   pages, they would finish producing those by some point later
9   this fall.  With the exact dates, we could come up with a
10  proposal, but the overall proposal being doing the nonpriority
11  grants next, with an aim to finish them by the end of this
12  year.  And then maybe during that time period the parties could
13  work together to try to narrow down what has become a very
14  large number of pages with respect to the communications to
15  determine whether some of them are nonresponsive or plaintiffs
16  aren't interested in them or perhaps using some degree of
17  search terms, in addition to the grant number search term that
18  NIH has already used, to bring down the number of pages of
19  these other communications documents.
20  　　　　In broad strokes, your Honor, that's the proposal that
21  NIH would put forward.
22  　　　　THE COURT:  Good.  Thank you very much.
23  　　　　So counsel for the United States, first, I appreciate
24  that the government was able to act expeditiously to review the
25  priority grants in accordance with my prior direction.  That

1  was informed by my understanding of what the process was likely
2  to be with respect to these grants; in other words, that a big
3  part of the review process would actually be the review by the
4  grantee.
5        Why would a timetable equivalent to the one that I put
6  in place with respect to the priority grants not be appropriate
7  for the nonpriority grant?
8        MR. HOGAN:  Well, your Honor, I think that even though
9  the number of pages are similar, it is -- to put some exact
10 numbers on it, I believe that the priority grants were, I
11 believe, two actual grants, if you want to call them that, and
12 then the rest were renewals of those grants.  So as plaintiff
13 alluded to in the prior conference, those are -- because you're
14 reviewing similar subject matter, it is reasonable to think
15 that those could be done on a faster timeline as opposed to now
16 there are 25 total documents for the nonpriority grants, which
17 I believe are -- I believe there are five -- there are five
18 grants and the rest are renewals.  So, in other words, the
19 number of grants is more than doubled, and then the number of
20 renewals is certainly more than doubled.  It's probably three-
21 or fourfold what the priority grants were.  So the degree of
22 efficiency is certainly not the same as with respect to the
23 priority grants.
24       THE COURT:  Good.  Thank you very much.
25       Counsel, does the government's proposal take into

1  account the amount of time needed by the grantees to review the
2  grant?
3        MR. HOGAN:  Yes.  The government's proposal would be
4  that they would produce, like I said, 300 pages of records.  I
5  mean, if we're picking sort of dates, October 15, November, and
6  December 15, and that by each of those dates, they would have
7  had input from the grantee to make productions by those dates.
8        THE COURT:  Good.  Thank you.
9        Counsel for the United States, just to help me
10 understand your proposal, is it your suggestion that the
11 discussion related to possible ways to structure the production
12 of the remaining records would be deferred until after that
13 production of nonpriority grants was completed, or is it your
14 expectation that you would begin working with plaintiff during
15 this window of time to develop search terms or other ways to
16 potentially cull from this volume of records?
17       MR. HOGAN:  So, your Honor, the expectation would be
18 that we would have these discussions over the course of the
19 period when we are doing the nonpriority grants, however long
20 that turned out to be.  So there would be, obviously, if you
21 want to call it, dual tracking, I suppose.  The only thing I
22 would note is that there often is a conception out there that
23 it's simple to run search terms in very large databases of
24 documents, which perhaps that's true in some context or certain
25 entities have that capability in the legal world.  Many

1    agencies don't. So we are very particular and sort of mindful
2    of resources, and we can't just do millions of millions, but
3    many, many iterations of new and different search terms.
4              So I guess what I'm saying, your Honor, is, yes, these
5    will definitely be going on at the same time, but it is not
6    always the most streamlined of process to get documents
7    narrowed down. But, yes, it's our expectation that it would be
8    occurring simultaneously.
9              THE COURT: Good. Thank you very much.
10             Counsel for plaintiff, what's your reaction?
11             MS. NOBLE: Thank you. It is Victoria Noble.
12             Going over our proposal, we actually agree that we
13   would like the grant proposals next, the remaining grant
14   proposals. That said, we believe they should be produced by
15   October 1, 2021. That is, there's a roughly equivalent number
16   of pages in this batch of proposals as there were in the last
17   batch of proposals. I understand that there are five grant
18   proposals and other renewals, rather than two grant proposals
19   and renewals. That said, the government hasn't shown why they
20   can't produce these in a reasonable time frame. We don't
21   believe waiting till December to receive them is reasonable,
22   especially given the increased newsworthiness of these grant
23   proposals, which NIH recognizes.
24             In addition to other grantees seeking information
25   about these, as NIH said, even in the past week there has been

1  increase interest in EcoHealth Alliance and Dr. Daszak.  The
2  House Republican staff of the National Security Committee
3  called to have Dr. Daszak testify, or they think he should be
4  subpoenaed, and they argued he is responsible for helping cover
5  up a lab leak-type cause to the pandemic.  Whether or not this
6  is true, this is very likely to generate immense public
7  interest, and it is resulting in intense controversy for the
8  agency.  So we believe it's in everyone's interest to get the
9  public this information quickly, and we believe it's reasonable
10 to order them to do so within a month, given that they appear
11 able to meet the Court's last order.
12          THE COURT:  Thank you, counsel.
13          Let me hear from you, first, counsel for plaintiff,
14 about your response to the government's suggestion that there
15 is the opportunity to cull or, I should say, narrow the
16 requests for the remaining 11,000 documents.
17          Do you agree that there's an opportunity there?  Are
18 you willing and able to work with the government to try to make
19 that search process efficient?
20          MS. NOBLE:  Well, I would have to speak with the
21 reporters who requested documents.  That said, the request was
22 highly specific.  They asked for communications related to just
23 these specific grounds, and they, if I remember correctly,
24 searched for these communications by grant number.  So all the
25 communications should be directly relevant.

We also believe that some of the attachments, and more than 5,000 of the 11,000 pages are attachments, are likely to include the grant proposals themselves because these are communications about the grant proposals. For that reason, we think that that might be a bit of an overestimate of the amount of, like, unique pages that haven't already been reviewed in this 11,000 bucket of documents. That said, if our reporters are willing, we are definitely willing try to work with the government to limit this number of documents.

THE COURT: Good. Thank you.

Let me just hear briefly from the government, again, regarding the capacity constraints. You've already provided some information to the Court on that front, but I understand that the principal limiting factor here are the capacity constraints of the agency to respond to these requests, in particular during the pandemic.

Counsel for the United States, can I hear another proffer from you regarding the capacity constraints that I understand to be the principal basis for your requested schedule.

MR. HOGAN: Yes, your Honor. I think that what I would say is just largely reiterating what NIH said in its initial letter advocating to the Court and the declaration that was attached to it. It's certainly the case, as I think all of the public is aware, that things aren't necessarily abating

with respect to the pandemic, either from a public interest perspective as it applies to the FOIA office or from a substantive perspective of how to substantively deal with pandemic and advise the public from a public health perspective. And just as laid out in that declaration, the facts can't be argued with as to the additional, I guess, constraints that were placed on the NIH FOIA office as compared to pre-pandemic levels. And as maybe the Court's aware, it's sometimes hard for the government to quickly staff up a FOIA office in a given agency in response to a pandemic when half of the government was shut down for an extended period to begin with.

But, in short and in substance, the NIH nearly doubled its caseload from pre-pandemic levels to post-pandemic levels with respect to its FOIA processing, and just as a very simple matter, they haven't been able to increase capacity to deal with that. As I very much tried to tell the Court, and perhaps this doesn't reflect wonderfully on the agency, but it is not as though they are trying to treat plaintiffs' request differently than others. In fact, they are trying to treat it exactly the same as all others in what they're advocating for with respect to processing rates. They have backlogs of hundreds upon hundreds upon hundreds of FOIA requests. When we wrote that declaration I believe was nearly 600 in a backlog state. So it's not as though they are perfectly processing all

1   others and neglecting plaintiffs'.  So I'm not saying that that
2   is something to be applauded, but I'm trying to give context as
3   to where the agency stands at the moment.
4            THE COURT:  Good.  Thank you very much, counsel.
5            I appreciate the arguments.  I understand the capacity
6   constraints that counsel for the United States has described.
7   I also understand the plaintiffs' entitlement to these records
8   timely and also the public interest associated with these
9   records.  So I'm going to order the following:
10           I am ordering that the nonpriority grants be produced
11  no later than November 15.  The remaining documents will be
12  provided on a rolling basis on a 300-page-per-month schedule as
13  initially proposed by the United States.  My hope is that
14  plaintiffs will work with the government to focus their
15  requests, understanding that an unfocused request with a
16  baseline of 11,000 emails will lead to a later completion of
17  production than a much more focused request.
18           The capacity constraints that the government has
19  described are real.  I think that by prioritizing the early
20  release of the grant documents themselves and then encouraging
21  the parties to work together to focus the search of the
22  remaining documents balances the unfortunate but, as I
23  understand it, true capacity constraints of the agency against
24  the entitlement of plaintiff to these records.
25           It is unfortunate that the government does not have

complete staffing to fulfill these applications timely.  That is not my bailiwick, but I have to recognize the realities in setting an appropriate schedule here.  Again, my hope is that through a discussion related to the records that are needed you will be able to focus the agency's efforts with respect to those remaining documents on things that are most likely to be useful, and I encourage the parties to do just that.

With that in mind, I'm going to ask that the parties provide me with a status letter no later than December 1 that will tell me whether you have been successful in discussing or negotiating search protocol with respect to the remaining 11,000 or so documents, and I also expect that you will report at that time that the government has complied with both of the orders for production of the grants.

Anything else for us to take up here?  First, counsel for plaintiff?

MS. NOBLE:  I don't believe so at this time.  Thank you, your Honor.

THE COURT:  Thank you.

Counsel for defendant?

MR. HOGAN:  Your Honor, I think the only clarification I would take, and maybe it was because I wasn't listening perfectly.  I tried to, I promise.  But as to the 300 per month, are you ordering that the agency produce 300 pages per month or process 300 pages per month as initially advocated

1 for?

2 THE COURT: Thank you. Thank you.

3 So the principal issue there relates to one of the
4 issues that the plaintiff pointed out, namely, the possibility
5 of duplicate records. The concern about a production-based
6 schedule, from my perspective, is that would allow the agency
7 to -- not saying this in a way that's intended in any way to
8 suggest that the agency would intentionally do this or that
9 would be their goal -- but to pad their monthly productions
10 with productions that include attachments which were documents
11 previously produced and, as a result, be able to achieve that
12 goal.

13 I just want to talk about the distinction between
14 "produce" versus "processed" with that principal issue in mind,
15 and if there are other issues for the Court to consider, please
16 raise them.

17 But, counsel for plaintiff, let me hear first from
18 you.

19 MS. NOBLE: Thank you, your Honor.

20 We would advocate for a production of 300 records per
21 month, or, alternatively, if it is an order to simply process
22 300 pages per month, that it exclude duplicates, in particular
23 duplicates of grant proposals that the agency has already
24 processed and, hopefully by that point, released. But we
25 believe that an order that the agency actually produce 300

1  records per month better serves the goal of balancing the need
2  to recognize capacity constraints as well as promote production
3  of the records.
4            THE COURT:  Good.  Thank you.
5            Counsel for the government.
6            MR. HOGAN:  Your Honor, I think that the NIH is
7  typically asked to process 300 pages per month, but understands
8  your Honor's concerns about not wanting to send out duplicate
9  pages, 300 pages of the same document.  So I think that would
10 be a reasonable middle ground here.
11           THE COURT:  Very good.  Thank you very much.
12           I will enter an order accordingly, and I can formulate
13 it in one of two ways:  One, as the way that I'm leaning, which
14 would be to produce 300 pages per month excluding duplicates,
15 to the extent that the government can track that.
16           Counsel for the United States, is that operable?
17           MR. HOGAN:  Honestly, your Honor, I do not know if the
18 agency has the capacity to deduplicate documents in their sort
19 of software system.  That's something I can certainly inquire
20 into.  If they do not, then that sort of becomes the difficulty
21 here because you would need to, with a fine-tooth comb
22 presumably, determine whether or not two documents are
23 duplicative of each other.
24           THE COURT:  Good.  Counsel, let me do this:  The order
25 is to produce 300 pages as counsel for plaintiff just

L8UHFirC

1  suggested.  Counsel, in your status letter on the 1st of
2  December, please provide additional information on the agency's
3  ability to identify duplicates in the processing and production
4  of the, hopefully, subset of the 11,000 documents for which the
5  agency will be searching.
6           Very good.  This proceeding is adjourned.
7           (Adjourned)